PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2954

_____

DIANOIA'S EATERY, LLC, doing business as DIANOIA'S
and PIZZERIA DAVIDE

v.

MOTORISTS MUTUAL INSURANCE COMPANY,
                                        Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:20-cv-00787
District Judge:  Hon. Nora B. Fischer

_____

No. 20-2958

_____

UMAMI PITTSBURGH, LLC d/b/a Umami

v.

MOTORISTS COMMERCIAL MUTUAL INSURANCE
COMPANY,

                              Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:20-cv-00999
District Judge:  Hon. David S. Cercone

_____

No. 20-3122

_____

MARK DANIEL HOSPITALITY LLC, doing business as
INC

v.

AMGUARD INSURANCE COMPANY,

                              Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
No. 3:20-cv-06772
District Judge:  Hon. Freda L. Wolfson

_____

Argued April 28, 2021

Before:  SMITH, *Chief Judge*, PHIPPS, and ROTH,

-2-

*Circuit Judges.*

(Filed:  August 18, 2021)

———————————

Timothy A. Carroll
CLYDE & CO US LLP
2000 Campus Drive
Suite 300
Florham Park, NJ 07932

John R. Gerstein                    [ARGUED]
Patrick F. Hofer
CLYDE & CO US LLP
1775 Pennsylvania Avenue NW
Suite 400
Washington, DC 20006

Robert E. Dapper, Jr.
Matthew A. Meyers
Taylor M. Davis
BURNS WHITE
48 26th Street
Burns White Center
Pittsburgh, PA 15222
  *Counsel for Appellants Motorists Mutual Insurance*
  *Company, Motorists Commercial Mutual Insurance*
  *Company*

Daniel B. Feder                    [ARGUED]
Bryce L. Friedman
Michael J. Garvey

-3-

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017

Susan M. Leming
BROWN & CONNERY, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
    *Counsel for Appellant AmGUARD Insurance Company*

Scott B. Cooper
SCHMIDT KRAMER, P.C.
209 State Street
Harrisburg, PA 17101

John P. Goodrich
JACK GOODRICH & ASSOCIATES, PC
429 Fourth Avenue
Suite 900
Pittsburgh, PA 15219

James C. Haggerty                    [ARGUED]
HAGGERTY, GOLDBERG, SCHLEIFER, & KUPERSMITH, P.C.
1835 Market Street
Suite 2700
Philadelphia, PA 19103

Jonathan Shub
SHUB LAW FIRM, LLC
134 Kings Highway East
2nd Floor

-4-

Haddonfield, NJ 08033
　　*Counsel for Appellees DiAnoia's Eatery, LLC, Umami Pittsburgh, LLC*

Ralph P. Ferrara　　　　　　　　　[ARGUED]
Kevin J. Kotch
FERRARA LAW GROUP, P.C.
1 Holtec Drive
Suite G102
Marlton, NJ 07728
　　*Counsel for Appellee Mark Daniel Hospitality LLC*

＿＿＿＿＿＿＿＿＿

## OPINION OF THE COURT

＿＿＿＿＿＿＿＿＿

SMITH, *Chief Judge*.

The COVID-19 pandemic has had a devastating impact on the restaurant industry.  Since at least March 2020, the risk of virus transmission has discouraged a significant number of customers from patronizing restaurants.  And in response to the pandemic, state and local government officials have issued public health orders restricting how restaurants operate by, among other things, restricting their hours of operation, imposing strict occupancy limits, and even prohibiting in-person dining.  Consequently, many restaurants have suffered a substantial decrease in business with resulting lost income.

The three Restaurants in these consolidated appeals each brought its own action in state court seeking a declaration that

-5-

its respective Insurer was obligated to provide coverage for COVID-19-related losses under an insurance policy. Each Insurer removed its case to federal court invoking diversity jurisdiction. Then, each District Court exercised its discretion under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–02, to abstain from hearing the case and ordered the matter be remanded to state court. It is these exercises of discretion under the DJA that lie at the heart of the three appeals.

We conclude that the District Courts erred in weighing factors relevant to the exercise of discretion under the DJA, and therefore will vacate the removal orders and remand for renewed consideration of all relevant factors.

## I. LEGAL BACKGROUND

Generally, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have "virtually unflagging obligation . . . to exercise the jurisdiction given them"). Declaratory judgment actions implicate an exception to this rule. *See Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 134–35 (3d Cir. 2014). The DJA provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). The Supreme Court has long held that the DJA's "textual commitment to discretion"—*i.e.*,

-6-

"may"—"confer[s] . . . unique and substantial discretion" upon district courts to decide whether to exercise jurisdiction in declaratory judgment actions. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995); *see also Reifer*, 751 F.3d at 139. In other words, a district court may abstain from hearing a declaratory judgment action that is properly within the court's subject matter jurisdiction.

However, a district court's discretion under the DJA is not absolute. It is "bounded and reviewable." *Reifer*, 751 F.3d at 140 (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942); *Wilton*, 515 U.S. 277)). Over the years, we have articulated several factors that district courts should consider when exercising discretion under the DJA. *Id.* In our most comprehensive discussion of these factors, *Reifer*, we began by noting that the "existence or non-existence of pending parallel state proceedings [to the declaratory judgment action]," while not dispositive, is a factor that "militates significantly" in favor of either declining or exercising jurisdiction, respectively. *Id.* at 144–45. We then enumerated eight factors that a district court should consider "to the extent they are relevant":

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
>
> (2) the convenience of the parties;
>
> (3) the public interest in settlement of the uncertainty of obligation;
>
> (4) the availability and relative convenience of other remedies;

-7-

(5) a general policy of restraint when the same issues are pending in a state court;

(6) avoidance of duplicative litigation;

(7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and

(8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.

*Id.* at 146.

The eight *Reifer* factors are not exhaustive. *Id.* We have also pointed to "additional guidance" from *State Auto Insurance Cos. v. Summy*, 234 F.3d 131 (3d Cir. 2000), as amended (Jan. 30, 2001), as applicable in the insurance context. *Reifer*, 751 F.3d at 146–47. *Summy*'s additional guidance includes the recommendation that "when applicable state law is 'uncertain or undetermined, district courts should be particularly reluctant' to exercise DJA jurisdiction." *Id.* at 141 (quoting *Summy*, 234 F.3d at 135). Further, "[t]he fact that district courts are limited to predicting—rather than establishing—state law requires 'serious consideration' and is 'especially important in insurance coverage cases.'" *Id.* at 148 (quoting *Summy*, 234 F.3d at 135). Yet, we have cautioned that there can be no *per se* dismissal of insurance declaratory judgment actions, in part because "[f]ederal and state courts are

-8-

equally capable of applying settled state law to a difficult set of facts." *Id.* at 147 (alteration in original) (quoting *Heritage Farms Inc. v. Solebury Twp.*, 671 F.2d 743, 747 (3d Cir. 1982)).

In weighing these factors, "district courts declining jurisdiction should be rigorous in ensuring themselves that the lack of pending parallel state proceedings is outweighed by opposing factors." *Id.* at 144. With respect to state law claims, district courts should "squarely address" the alleged novelty or undetermined nature of state law issues. *Id.* at 149. Finally, "[t]he weighing of these factors should be articulated in a record sufficient to enable our abuse of discretion review." *Id.* at 147.

With that background, we turn to the cases before us.

## II. PROCEDURAL HISTORY

These three appeals follow a pattern. Each Restaurant had purchased an insurance policy that provided coverage for commercial property. Each policy was an "all risks" policy—meaning it covered losses unless specifically excluded—and contained a virus exclusion. Each Restaurant filed a complaint, styled as a declaratory judgment action, in state court that sought a declaration that its Insurer was obligated to cover losses arising from the COVID-19 pandemic and the associated government orders (or, in one case, solely because of the government orders). Each Insurer removed the case to federal district court. Finally, each District Court, in an order on appeal before us, declined to exercise jurisdiction under the DJA and granted each Restaurant's motion to remand the case

-9-

to state court.

Below, we focus on the unique aspects of the three complaints and summarize each District Court's stated reasons for declining to exercise jurisdiction under the DJA.

### A. Umami

### 1. Complaint

In June 2020, Umami Pittsburgh, LLC filed a complaint against Motorists Commercial Mutual Insurance Company[1] in the Court of Common Pleas of Allegheny County, Pennsylvania. The central allegations of the complaint, as described in the portion summarizing Umami's "Claim for Recovery," is that Umami made an insurance claim upon Motorists for losses and "damages" caused by the COVID-19 pandemic and the associated public health orders issued by the Governor of Pennsylvania, and that Motorists wrongfully denied the claim. Motorists App'x[2] 591 (Compl. ¶¶ 30–32).

Umami's insurance policy, attached to its complaint, provides that coverage was in effect until October 2020. The policy contains a virus exclusion which states that Motorists

---

[1] We refer to Motorists Commercial Mutual Insurance Company and Motorists Mutual Insurance Company both individually and collectively as "Motorists."

[2] "Motorists App'x" refers to the appendix filed in consolidated appeals 20-2954 (DiAnoia's) and 20-2958 (Umami). "AmGUARD App'x" refers to the appendix filed in appeal 20-3122 (INC).

"will not pay for loss or damages caused directly or indirectly by . . . [a]ny virus, . . . capable of inducing physical . . . illness or disease." Motorists App'x 633, 636. And the virus exclusion further provides that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.* at 633.

Umami's complaint is styled as a "Civil Action – Complaint Seeking Declaratory Relief." *Id.* at 587. The complaint's sole count is for "Declaratory Relief – Individual Claims." *Id.* at 592. The count re-alleges that Motorists "wrongfully refused to provide coverage" to Umami and that this refusal "is a material breach of [the insurance] policy." *Id.* at 592 (Compl. ¶¶ 39–40). The count states that Umami is entitled to a declaration that it is covered under the policy and asserts that "[a] judgment of this court will determine, terminate and afford relief from the uncertainty and controversy giving rise to this action." *Id.* at 592–93 (Compl. ¶¶ 42, 47). As for the relief requested, Umami seeks only an order declaring that it is entitled to coverage under the policy and "such other relief as the court deems appropriate." *Id.* at 593.

On July 3, 2020, Motorists removed the case to the United States District Court for the Western District of Pennsylvania on the basis of diversity jurisdiction. On July 29, 2020, Umami moved to remand the case back to Common Pleas, arguing that because the case was only for declaratory relief and only involved an issue of state law, the District Court should decline

-11-

to hear the case.[3]

## 2. Remand

In August 2020, the District Court granted Umami's motion to remand. The Court first rejected Motorists's argument that, because the complaint "expressly alleges a breach of contract claim," the District Court had no discretion under the DJA to decline to hear the case. *Umami Pittsburgh, LLC v. Motorists Comm. Mut. Ins. Co.*, 2020 WL 9209275, at *1 n.1 (W.D. Pa. Aug. 26, 2020) (quotations omitted). "Having read the Complaint and Amended Complaint, the Court f[ou]nd[] that Plaintiff seeks solely declaratory relief." *Id.*

The Court then turned to the question of discretion under the DJA. In its summary of the potentially relevant factors, the District Court quoted heavily from *Summy* and *Reifer* but failed to discuss the importance of the existence or non-existence of parallel state proceedings. *Id.* at *1–2. In a footnote, the Court correctly stated that there was no parallel state proceeding. *Id.* at *2 n.2. After listing the eight factors articulated in *Reifer*, the Court concluded that the first factor was "relevant and determinative" and that it weighed in favor of abstention because the COVID-19 pandemic raised "novel business insurance coverage issues under Pennsylvania law," and a federal court "would be predicting how Pennsylvania courts would decide the COVID-19 coverage issues with little or no

---

[3] The same day it filed its motion to remand, Umami also filed an amended complaint in federal court. The amended complaint is nearly identical to the original. None of the differences between the complaints is material to our decision.

-12-

persuasive authority from the Pennsylvania state courts." *Id.* at *2.

Motorists appealed the remand order.[4]

### B. DiAnoia's

*1. Complaint*

In April 2020, DiAnoia's Eatery, LLC filed a complaint against Motorists Mutual Insurance Company in the Court of Common Pleas of Allegheny County, Pennsylvania. The complaint is nearly identical to Umami's complaint, with only the name of the restaurant and details of the insurance policy changed.[5] The policy between Motorists and DiAnoia's was to remain in effect until June 2020. The policy's virus exclusion provides that Motorists "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Motorists App'x 306.

On May 29, 2020, Motorists removed the case to the United States District Court for the Western District of Pennsylvania on the basis of diversity jurisdiction.[6] On June 16, 2020,

---

[4] The remand order was subsequently amended so that the District Court would not be divested of jurisdiction during the pendency of the appeal.

[5] Umami and DiAnoia's were represented by the same counsel before the trial courts and before this Court.

[6] Motorists had previously attempted to remove the case on May 14, 2020. The District Court remanded *sua sponte* for

DiAnoia's moved to remand the case back to the Court of Common Pleas.

### 2. Remand

In August 2020, the District Court granted the motion to remand. The Court, like the court in *Umami*, rejected at the outset Motorists's argument that the complaint stated a breach of contract claim outside the scope of the DJA. After reiterating that the only relief sought in the complaint was for a declaration, the Court reasoned that "Plaintiff is the master of its complaint and certainly could have, but chose not to, pursue theories for legal relief" and that the mere possibility of additional claims "does not negate the Court's discretion under the DJA." *DiAnoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, 2020 WL 5051459, at *2–3 (W.D. Pa. Aug. 27, 2020) (citing *Greg Prosmushkin, P.C. v. Hanover Ins. Grp.*, 479 F. Supp. 3d 143, 149 (W.D. Pa. 2020); *Umami*, 2020 WL 9209275, at *1).

While noting that there was no parallel state proceeding, the Court concluded that the first, third, fourth, and fifth *Reifer* factors weighed in favor of remand. *Id.* at *1, *3–4. The Court's principal reason for remand was that "Plaintiff's Complaint raises novel insurance coverage issues under Pennsylvania law, (i.e., business interruption, civil authority, extra expense, contamination, as well as pertinent exclusions

---

lack of subject matter jurisdiction because Motorists had not averred diversity of citizenship under the correct citizenship standard for limited liability companies. In the alternative, the Court stated it would decline to exercise jurisdiction under the DJA.

raised by the defense), which are best reserved for the state court to resolve in the first instance." *Id.* at *3.  Additionally, the Court noted that insurance is a "highly regulated industry," "with policy language and premium rates being approved by the Pennsylvania Insurance Department," and that the public health restrictions impacting DiAnoia's "were issued by state and local authorities." *Id.* at *4.

With respect to other *Reifer* factors, the District Court excerpted the reasoning of the district courts in *Umami* and *Greg Prosmushkin*. *Id.* at *3.  These excerpts included the observation that "[i]nsurance liability related to the COVID-19 pandemic is likely to be the subject of a significant number of cases in Pennsylvania state court." *Id.* at *4 (quoting *Greg Prosmushkin*, 479 F. Supp. 3d at 151).  The Court did not specify how "the availability and relative convenience of other remedies," *Reifer*'s fourth factor, weighed in favor of remand.

Motorists appealed the remand order.[7]

**C. INC**

*1. Complaint*

In May 2020, Mark Daniel Hospitality LLC d/b/a INC

---

[7] Motorists also moved for reconsideration to request that the District Court retain jurisdiction during this appeal.  The Court denied the motion as moot because it had instructed the Clerk of Court to not immediately transmit the remand order to the Prothonotary of the Court of Common Pleas of Allegheny County.

-15-

(short for Ingredients-n-Craft) filed a complaint against AmGUARD Insurance Company in the Superior Court of New Jersey, Law Division, Mercer County.  Unlike Umami and DiAnoia's, INC does not allege in its complaint that it has made a claim for COVID-19-related losses and that its insurer has denied the claim.  Rather, INC alleges that insurers like AmGUARD have routinely denied coverage for similar business interruption losses.  Also unlike Umami and DiAnoia's, INC alleges that it is the government orders that "physically impact[]" its business, not the virus that causes COVID-19.  AmGUARD App'x 24 (Compl. ¶ 21); *see also id.* (¶ 20) ("These limitations and closures of Plaintiff's business are the result of the Orders. To Plaintiff's knowledge, at no time has any employee or patron of Plaintiff been diagnosed with COVID-19.").

INC's policy was effective through November 2020.  The language of the virus exclusion in INC's policy—"We will not pay for loss or damage caused directly or indirectly by any [virus] . . . . regardless of any other cause or event that contributes concurrently or in any sequence to the loss"—is identical to the exclusion in Umami's policy with Motorists.

INC's complaint is styled as a "Complaint for Declaratory Relief" and contains one count titled "Declaratory Judgment." AmGUARD App'x 21, 24.  INC seeks a declaration that "AmGUARD is obligated to provide coverage to Plaintiff for business interruption and extra expense losses from the closure of its business as a result of the Orders." *Id.* at 26 (wherefore cl.).  INC explicitly disclaims that it seeks "a determination of whether the Coronavirus was present in its business, the amount of Plaintiff's damages or any remedy other than the

-16-

requested declaratory relief." *Id.* at 25 (Compl. ¶ 28).  As part of this requested relief, INC seeks a declaration that "[a]pplication of the virus exclusion in the Policy to Plaintiff's losses is void as against public policy." *Id*. at 26 (wherefore cl., para. g.)

In June 2020, AmGUARD removed the case to the United States District Court for the District of New Jersey on the basis of diversity jurisdiction.  INC moved to remand the case to the Superior Court on two grounds: 1) that AmGUARD had failed to establish that the amount in controversy exceeded $75,000, *see* 28 U.S.C. § 1332(a), and 2) that the District Court "should exercise its discretion to not hear this declaratory judgment action involving solely undecided state law insurance issues." AmGUARD App'x 42 (INC Motion to Remand).

### 2. *Remand*

In October 2020, the District Court granted INC's motion and remanded the case to state court.  *See Mark Daniel Hospitality, LLC v. AmGUARD Ins. Co.* (*INC*), 495 F. Supp. 3d 328 (D.N.J. 2020).  The Court did not decide the amount-in-controversy issue, explicitly noting that it was instead remanding because it declined to exercise jurisdiction under the DJA.  *Id.* at 332 n.4.  It also prefaced its analysis of the discretionary DJA factors by noting that "[i]mportantly, it is undisputed, here, that Plaintiff seeks only declaratory relief under the DJA and asserts no other independent legal claims in its Complaint." *Id.* at 333.

The District Court determined that the third and fifth *Reifer* factors outweighed the lack of parallel state proceedings.  *Id.*

-17-

at 334. As to the third factor—public interest—INC's complaint "present[ed] novel and important issues of state insurance law," including whether the virus exclusion would apply to the asserted losses and whether the virus exclusion was void as against public policy. *Id.* at 335. "As such, one of the key issues in this case is whether . . . . a state government order, which required partial closure of businesses, constitutes 'loss or damage caused directly or indirectly' by a virus." *Id.* The Court reasoned that an answer to that question would require "circumstance-specific determinations that would be made with relatively undetermined state law and implications of important state public policy." *Id.* at 335–36 (cleaned up) (quoting *Venezie Sporting Goods, LLC v. Allied Ins. Co. of Am.*, No. 2:20-cv-01066, 2020 WL 5651598, at *4 (W.D. Pa. Sept. 23, 2020)).

As to the fifth factor—"a general policy of restraint when the same issues are pending in state court"—the District Court noted that "[a] significant number of cases related to insurance coverage for business interruption based on COVID-19 closures are pending across the country, including in the New Jersey state courts." *Id.* at 336. Furthermore, "the law on this issue remain[ed] unsettled" because "as one New Jersey state court judge recently observed in denying a motion to dismiss a similar state court action, 'there is limited legal authority in the State of New Jersey addressing this issue.'" *Id.* (quoting *Optical Servs. USA/JCI v. Franklin Mut. Ins. Co.*, No. BER-L-3681-20, 2020 N.J. Super. Unpub. LEXIS 1782, at *24 (N.J. Super. Ct. Law Div. Aug. 13, 2020) (oral order)).

-18-

AmGUARD appealed the remand order.[8]

### III. JURISDICTION

"Although courts often refer to a court's 'jurisdiction' under the DJA, the statute is not a jurisdictional grant." *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 281 n.4 (3d Cir. 2017). Here, Insurers invoked diversity of citizenship jurisdiction as the basis for removal pursuant to 28 U.S.C. §§ 1332(a) and 1441(a). "A district court's discretionary remand in a declaratory judgment action is a final decision that is appealable under 28 U.S.C. § 1291." *Kelly*, 868 F.3d at 280 (citing *Reifer*, 751 F.3d at 133).

### IV. ANALYSIS

Insurers raise two arguments. First, Insurers argue that the District Courts did not have discretion under the DJA to decline to exercise jurisdiction because Restaurants' complaints are for legal relief that is merely "masquerading" as declaratory relief. We review *de novo* the District Courts' determination that the DJA applied. *See Reifer*, 751 F.3d at 134 n.3 (citing *Lazorko v. Pa. Hosp.*, 237 F.3d 242, 247 (3d Cir. 2000)). Second, Insurers argue that the District Courts erred by declining to exercise jurisdiction. We review such decisions for abuse of discretion. *Id.* at 137–39.

We will address each argument in turn. We agree with Restaurants that the DJA applies and that the District Courts

---

[8] The remand order was subsequently amended so that the District Court would not be divested of jurisdiction during the pendency of the appeal.

-19-

did have discretion to abstain.   However, we ultimately
conclude that each of the District Courts either misinterpreted
some of the non-exhaustive factors that our own Court has
stated should be considered, did not squarely address the
alleged novelty of state law issues, or did not create a record
sufficient to permit thoughtful abuse of discretion review.

### A. Applicability of the DJA

Insurers contend that the District Courts had no discretion
under the DJA to abstain because the complaints, styled as
declaratory judgment actions, did not *really* seek declaratory
relief.   The primary difficulty with this argument is that
Insurers are unable to identify a case—nor have we found
one—in which our Court determined that a self-styled
declaratory judgment action was something other than a
genuine declaratory judgment action for purposes of the DJA.
Insurers instead rely heavily upon one line in our *Reifer*
opinion in which we suggested that "[i]t may, in some
circumstances, be possible for a party's claim for legal relief to
masquerade as a declaratory judgment, improperly activating
discretionary jurisdiction." 751 F.3d at 137.   But in *Reifer* we
held the DJA *did apply*, and we affirmed the district court's
order declining to exercise jurisdiction. *Id.* at 150.   Thus
Insurers, while relying on *Reifer*'s "masquerade" phrase,
attempt to distinguish the instant complaints from the one at
issue in *Reifer*.   A brief summary of that case will help illustrate
how Insurers' distinctions are immaterial.

*Reifer* involved a client who was grievously ill-served by
her Pennsylvania attorney. 751 F.3d at 132.   The attorney, as
required by the Rules of Professional Conduct promulgated by

-20-

the Pennsylvania Supreme Court, carried "claims-made" legal malpractice insurance. *Id.* But when the client initiated a legal malpractice proceeding against the attorney in state court, the attorney failed to timely inform his insurer of the action. *Id.* The insurer, predictably, declined to defend or indemnify the attorney. *Id.* A jury awarded the client over $4 million in damages in a suit against her attorney, at which point the attorney assigned any rights he had against his insurer to the client. *Id.* The client then filed a declaratory judgment action in state court seeking a declaration that the insurer "must pay" the earlier judgment because "under Pennsylvania case law and Pennsylvania Rule of Professional Conduct 1.4(c), [insurer] was required to show it was prejudiced by [attorney]'s failure to notify it of her claim." *Id.* The insurer removed the case to federal court, but the district court declined to exercise jurisdiction under the DJA. *Id.* at 132–33.

Our Court affirmed the district court's order declining to exercise jurisdiction. *Id.* at 150. In so doing, we rejected the insurer's argument that "although [client]'s claim was couched in terms of a declaratory judgment, it was in reality a suit which sought a judgment compelling [insurer] to pay money damages." *Id.* at 135. The insurer had emphasized that "[b]ecause [attorney]'s liability had already been established, the declaratory judgment action was not prospective" and suggested that there "is no meaningful difference between a complaint seeking a declaration that a defendant 'must pay' damages and a complaint seeking to recover damages." *Id.* In rejecting that argument, we concluded that the words "must pay" did not change the fact that the requested relief was a declaration and the district court "was not being asked to award damages; both parties well knew that damages had already

-21-

been awarded in state court." *Id.* at 136. "Moreover," we held, the fact that "additional recovery would likely flow to [client] as a result of a declaration in her favor does not preclude applicability of the DJA" because the text of the statute makes clear that a court "'may' grant declaratory judgments 'whether or not further relief is or could be sought.'" *Id.* (quoting 28 U.S.C. § 2201(a)).

Turning back to the instant appeals, Motorists suggests that Umami and DiAnoia's both "stated a breach-of-contract claim under Pennsylvania law" by alleging that "they were entitled to 'coverage' — *i.e.*, money — for their 'losses, damages, and expenses,' and 'entitled to recover' those expenses from Motorists." Motorists Br. 17, 19 (quoting Motorists App'x 59–60 (DiAnoia's Compl. ¶ 38, wherefore cl.)). These isolated phrases are as inconsequential as the phrase "must pay" in *Reifer*. The Restaurants explicitly seek only an order entering a declaration. Their requested relief does not include damages or anything other than a declaration, and any statements that Restaurants incurred "damages" from COVID-19 do not change that fact. Putting a finer point on it, nowhere does any Restaurant request that a Court issue a monetary judgment or injunction that would be enforceable by attachment, lien, or threat of contempt if an Insurer disobeys. Restaurants seek only a declaration from the Courts of what their legal rights are under the policies.[9]

---

[9] In rejecting the argument that Restaurants' complaints seek only legal relief, we also reject Motorists's argument in the alternative that Restaurants seek both declaratory relief and legal relief.

-22-

AmGUARD takes a slightly different tack from Motorists by arguing that, first, INC *could have* brought a breach of contract claim instead of a declaratory judgment claim, and, second, INC's decision to instead bring a declaratory judgment action is artful pleading to avoid federal jurisdiction that should not be countenanced by a federal court. One problem for AmGUARD's argument is that there is nothing in the record evidencing that AmGUARD disclaimed coverage under its policy with INC, which would be a prerequisite for INC's bringing a breach of contract claim in the first place.[10]

The more fundamental flaw, however, is that, in determining whether the DJA applies, it is irrelevant whether a plaintiff *could have* sought legal relief as well. Declaratory relief is often not the sole relief available. The DJA explicitly accounts for the possibility of related non-declaratory relief by authorizing federal courts to grant declaratory relief "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Furthermore, unlike other actions, a plaintiff seeking only a declaratory judgment is not forced to bring every claim arising out of the same circumstances or risk having those claims foreclosed in future actions. The normal anti-claim-splitting rules of merger and bar do not apply to declaratory judgment actions. *See* Restatement (Second) of

---

[10] Another problem for AmGUARD is that it might have forfeited this argument by not raising it in the District Court. *INC*, 495 F. Supp. 3d at 333 ("Importantly, it is undisputed, here, that Plaintiff seeks only declaratory relief under the DJA."). Because we conclude that INC's complaint is not "masquerading," we need not resolve the effect of AmGUARD's failure to preserve this argument.

-23-

Judgments § 33 cmt. c (1982) ("The effect of such a declaration, . . . is not to merge a claim in the judgment or to bar it. Accordingly, regardless of outcome, the plaintiff or defendant may pursue further declaratory or coercive relief in a subsequent action. . . . [I]f the claim has already accrued, refusal of bar or merger effects permits a claim to be split."); *Alexander & Alexander, Inc. v. Van Impe*, 787 F.2d 163, 166 (3d Cir. 1986), as amended (May 20, 1986) ("The language of the Declaratory Judgment Act itself indicates that a declaration as to the rights and obligations of the parties is not *res judicata* of a subsequent action for damages." (citing 28 U.S.C. § 2202)).

The possibility that a plaintiff could seek other, non-declaratory forms of relief remains irrelevant to the applicability of the DJA regardless of the plaintiff's motive for choosing to bring a declaratory judgment action. Here, Restaurants want to remain in state court[11] (and eventually recover money from their Insurers) and Insurers want to be in federal court (and do not want to pay out). It is certainly plausible that Restaurants brought declaratory judgment

---

[11] At oral argument, counsel for INC began by expressing ambivalence as to the outcome of AmGUARD's appeal, *i.e.*, whether INC's declaratory judgment action is heard in state court or federal court. *See* Oral Arg. Recording at 26:58–27:33 ("Sometimes I wonder when I'm preparing for this argument whether I want to win or I want to lose. Judge [Douglas H.] Hurd in Mercer County has literally granted each and every motion to dismiss. . . . So why [counsel for Insurers] want to be in the Third Circuit, I have no idea."). This was a remarkably candid admission.

actions instead of breach of contract claims solely to avoid falling within a district court's "virtually unflagging" obligation to exercise diversity jurisdiction. But if so, what difference?

Insurers analogize this tactic to a plaintiff's attempt to fraudulently join a forum defendant in order to avoid diversity jurisdiction under 28 U.S.C. § 1332. *See generally Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014); *In re Briscoe*, 448 F.3d 201, 215–16 (3d Cir. 2006). But unlike a plaintiff's inclusion of a defendant whom the plaintiff has no true desire to proceed against, there is nothing remotely fraudulent here. The plaintiff, as master of the complaint, may make a genuine choice to limit the relief sought. A more apt analogy would be a plaintiff who decides to limit his or her damages claim to an amount below the amount-in-controversy threshold in order to avoid removal based on diversity jurisdiction—a long-accepted practice. *See, e.g.*, *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 294 (1938) ("If [the plaintiff] does not desire to try his case in the federal court he may resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove."); *Morgan v. Gay*, 471 F.3d 469, 474–75 (3d Cir. 2006) (applying same principle to removal under Class Action Fairness Act).

Lastly, Insurers suggest that Restaurants' sought-after declaratory relief is simply a masquerade because such relief would not be used to guide future conduct—it would only establish liability for past coverage denials. This argument also fails. For one thing, at the time each complaint was filed and at the time of each notice of removal, the policies of all

-25-

three restaurants were still in effect.  For another, we held in *Reifer* that the DJA applied to the plaintiff's declaratory judgment action notwithstanding the insurer's argument that "the declaratory judgment action was not prospective."  751 F.3d at 135.

Once again (or thrice), we reject an insurer's argument that the DJA does not apply to a declaratory judgment action. Because we cannot prove a negative, we cannot completely foreclose the possibility that "[i]t may, in some circumstances, be possible for a party's claim for legal relief to masquerade as a declaratory judgment, improperly activating discretionary jurisdiction."  *Reifer*, 751 F.3d at 137.  But, for the reasons stated above, we discern no such circumstances here.

**B.  Discretion to Abstain Under the DJA**

All three district courts declined to exercise jurisdiction under the DJA because each determined that one or more of the factors enumerated in *Reifer* outweighed the absence of parallel state proceedings.  The District Courts also considered *Summy*'s additional guidance regarding the unsettled nature of state law, but did so under the label of the third *Reifer* factor and its reference to "the public interest."  *Cf. Kelly*, 868 F.3d at 288 n.13 (noting that district court considered state interest in interpreting unsettled state law in relation to third factor). Because the Courts' analyses of the *Reifer* factors overlap significantly, our discussion below will be grouped by *Reifer* factor rather than set forth by individual appeal.  We will similarly address the unsettled nature of state law under the umbrella of the third *Reifer* factor, but will do so later in this opinion.

-26-

1. *First factor: "likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy"*

The *Umami* and *DiAnoia's* District Courts both concluded that the first *Reifer* factor weighed in favor of remand. The Courts reasoned that any declaration by a federal court would not "resolve the uncertainty of obligation" because federal courts are limited to predicting state law and certain insurance issues "have not been addressed by the Commonwealth's highest court." *Umami*, 2020 WL 9209275, at *2; *DiAnoia's*, 2020 WL 5051459, at *3 (quoting analysis from *Umami*). That is a misreading of the first *Reifer* factor.

The first *Reifer* factor is not intended to be a vehicle for considering the effect of a declaratory judgment on the development of state law. Indeed, the earliest formulation of the factor drew upon an analysis of relevant considerations under state declaratory judgment statutes and was not specific to "federal court" declarations. *Compare Bituminous Coal Operators' Ass'n v. Int'l Union, United Mine Workers of Am.*, 585 F.2d 586, 596–97 & n.20 (3d Cir. 1978) (citing Note, *Developments in the Law: Declaratory Judgments — 1941–1949*, 62 Harv. L. Rev. 787, 805–17 (1949)), *with United States v. Pa., Dep't of Env't Res.*, 923 F.2d 1071, 1075 (3d Cir. 1991) (inserting "federal court" before "declaration"). Instead, the first *Reifer* factor captures whether a declaration would bring about a "complete termination of the controversy" between the parties and thereby avoid duplicative, piecemeal litigation. Note, *supra*, at 805 (cleaned up). "There are two general types of situations which may make it unlikely that a declaration will prevent further litigation: (1) when one or

-27-

more persons have not been joined, but have an interest in the outcome of the action, and (2) when one or more issues have not been raised, but are a part of the controversy or uncertainty." *Id.* at 806.

Here, the declaratory judgment actions would bring about a complete termination of the parties' disputes without piecemeal litigation. *See Kelly*, 868 F.3d at 288 ("Declaratory relief by the District Court would unquestionably clarify and settle the dispute regarding [insurer]'s obligations under the insurance policy."). Restaurants admit as much by asserting, in their complaints, that a declaratory judgment will be sufficient to afford relief and settle their respective controversies. We see no mention of any interested party that has not been joined, nor any predicate issue that would undermine the usefulness of a judgment interpreting the parties' obligations under their respective insurance policies.

The District Courts' alternative understanding of the first *Reifer* factor would place a thumb on the scale in favor of abstention in the many diversity jurisdiction cases raising issues which have not been resolved by the relevant state's highest court. Yet even without a decision of a state's highest court, it is well-established that "we can 'garner assistance from the decisions of the state's intermediate appellate courts in predicting how the state's highest court would rule.'" *Maynard v. Rivera*, 675 F.3d 225, 230 (3d Cir. 2012) (quoting *Mosley v. Wilson*, 102 F.3d 85, 92 (3d Cir. 1996)). To the extent that the District Courts' treatment of the first *Reifer* factor resulted from such a paucity of authority from *any* Pennsylvania court so that predicting state law would be impossible, we conclude for the reasons stated *infra* Section

-28-

IV.B.3 that a remand is still warranted.

The *Umami* and *DiAnoia's* Courts erred in concluding that the first *Reifer* factor weighed in favor of remand because they labored under an incorrect understanding of the factor. The *Umami* Court's total reliance on the first factor in declining to exercise jurisdiction fell well short of a "rigorous" weighing of factors "articulated in a record sufficient to enable our abuse of discretion review." *Reifer*, 751 F.3d at 144, 146 n.22. So we will vacate the order in *Umami* and remand for further proceedings.

### 2. *Fifth factor: "general policy of restraint when the same issues are pending in a state court"*

The *DiAnoia's* and *INC* Courts concluded that the fifth *Reifer* factor weighed in favor of abstention because "[a] significant number of cases related to insurance coverage for business interruption based on COVID-19 closures are pending . . . in . . . state courts." *INC*, 495 F. Supp. 3d at 336; *see DiAnoia's*, 2020 WL 5051459, at *4 ("Insurance liability related to the COVID-19 pandemic is likely to be the subject of a significant number of cases in Pennsylvania state court." (quoting *Greg Prosmushkin*, 479 F. Supp. 3d at 151)). This conclusion reflects another misunderstanding of the meaning of one of the *Reifer* factors. The fifth factor's "policy of restraint" is applicable only when the "same issues" are pending in state court between the same parties, not when the "same issues" are merely the same legal questions pending in any state proceeding. *See Kelly*, 868 F.3d at 289 (holding fifth factor inapplicable where "issue of [insurer's] obligations under its insurance policy with [insured] is <u>not</u> pending in a

state court" and "[insurer] is not even a party in the pending state court action and the insurance coverage dispute cannot be fully resolved without [insurer]"); *see also Brillhart*, 316 U.S. at 495 ("Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, *between the same parties*." (emphasis added)), *cited by Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1217, 1224 (3d Cir. 1989) (original formulation of fifth *Reifer* factor in this Court).

Because the *Reifer* factors are non-exhaustive, a district court may still consider, when relevant, whether the same legal question at issue in a declaratory judgment action is at issue in state court proceedings between different parties.  Yet we question how this fact would ever militate against exercising jurisdiction.  At any given time, there are countless insurance cases pending in state courts which implicate some common application of state law.  Once again, "[f]ederal and state courts are equally capable of applying settled state law to a difficult set of facts." *Reifer*, 751 F.3d at 147.  Furthermore, it would undercut the policy and purpose of diversity jurisdiction— "prevent[ion of] apprehended discrimination in state courts against those not citizens of the State," *Erie R.R. v. Tompkins*, 304 U.S. 64, 74 (1938)—if a party were unable to seek a declaratory judgment in federal court because that declaration would require the unbiased application of a settled question of state law.

To the extent the District Courts' weighing of this factor depended on the state law question at issue being both common

-30-

*and* novel, we turn then to novelty.

### 3. Summy *and third factor: "the public interest in settlement of the uncertainty of obligation"*

Restaurants contend that the third *Reifer* factor weighs in favor of abstention because "there is no federal interest" in their claims and "[t]he decisions on insurance coverage would involve not only *an interpretation of novel issues of state insurance law* but also on [sic] the legal impact of unprecedented orders of New Jersey state officials." INC Br. 21 (emphasis added). As an initial matter, federal courts sitting in diversity have "the usual interest in the fair adjudication of legal disputes." *Kelly*, 868 F.3d at 288. While we have suggested that district courts should be reluctant to exercise DJA jurisdiction "[w]here state law is uncertain or undetermined," we have instructed district courts exercising discretion under the DJA to "squarely address the alleged novelty of . . . state law claims." *Reifer*, 751 F.3d at 148–49.

The *DiAnoia's* Court stated that the complaint presented "novel insurance coverage issues under Pennsylvania law" for which "there is not yet a body of caselaw developed by Pennsylvania courts due to the relative recency of the COVID-19 pandemic." 2020 WL 5051459, at *3. However, instead of addressing what precise "novel insurance coverage issues" were presented, the Court simply listed insurance policy provisions raised in the parties' briefing without further explanation: "business interruption, civil authority, extra expense, contamination, as well as pertinent exclusions raised by the defense." *Id.* Because this mere iteration fails to "squarely address the alleged novelty" of DiAnoia's claims, we

will vacate the *DiAnoia's* Court's order declining to exercise jurisdiction and remand for renewed consideration of all relevant factors.

The *INC* Court did address novelty more squarely. After stating that the complaint presents "novel and important issues of state insurance law," the Court identified novel issues of 1) whether the virus exclusion applied to INC's asserted losses, 2) whether the application of the virus exclusion is void as against public policy, 3) whether INC suffered any physical loss or damage from a government order, and 4) whether INC met the requirements for civil authority coverage under the policy. 495 F. Supp. 3d at 335. To the District Court, this meant that one of the "key" questions was "whether Plaintiff's business losses were caused by the presence of the COVID-19 virus or, rather, caused by the Executive Orders which prompted the closure of Plaintiff's restaurant." *Id.* The Court continued to explain that "[i]n other words, resolution of Plaintiff's claim requires consideration of whether a state government order, which required partial closure of businesses, constitutes 'loss or damage caused directly or indirectly' by a virus." *Id.* Ultimately, the Court concluded that "the public interest in resolving the uncertainty of obligation is best served by remand as it allows the New Jersey courts the opportunity to determine the impact of [government orders] on insurance coverage in the State of New Jersey." *Id.* at 336.

Taking the four issues in turn, the District Court overstated the novelty of the first issue regarding the applicability of the virus exclusion. Whichever court eventually resolves INC's claims on the merits will not be "determin[ing] the impact of

-32-

[government orders] on insurance coverage in the State of New Jersey." *Id.*  Rather, that court will be determining whether INC's virus exclusion, as interpreted under principles of New Jersey insurance law, applies to INC's claim of lost revenue due to government orders.  No party has suggested that the principles of insurance law that would need to be employed in such an interpretation are unsettled.  Indeed, the relevant principles of New Jersey insurance law are easily summarized and are likely familiar in every state:

- "An insurance policy is a contract." *Villa v. Short*, 947 A.2d 1217, 1222 (N.J. 2008)
- "When interpreting an insurance policy, courts should give the policy's words 'their plain, ordinary meaning.'" *President v. Jenkins*, 853 A.2d 247, 254 (N.J. 2004) (quoting *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001))
- "If the policy terms are clear, we interpret the policy as written and avoid writing a better insurance policy than the one purchased." *Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 21 A.3d 1151, 1157 (N.J. 2011) (citing *Villa*, 947 A.2d at 1222)
- "However, if the language of the policy will support more than one meaning, 'courts [should] interpret the contract to comport with the reasonable expectations of the insured.'" *Sahli v. Woodbine Bd. of Educ.*, 938 A.2d 923, 930 (N.J. 2008) (alteration in original) (quoting *Zacarias*, 775 A.2d at 1264))

This is not to suggest that there can be no novel issue of

-33-

policy interpretation under New Jersey law.  But save for the word "virus," even the language of the policy's virus exclusion was not new to New Jersey insurance law.  Recall that the virus exclusion in INC's policy provides that "[AmGUARD] will not pay for loss or damages caused directly or indirectly by . . . [a]ny virus" and that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

That last sentence of the exclusion is an "anti-concurrent causation" clause that has been interpreted by New Jersey courts in the context of other policy exclusions, like flooding. *See, e.g.*, *Maritime Park, LLC v. Nova Cas. Co.*, No. A-3554-17T2, 2019 WL 1422918, at *5–6 (N.J. Super. Ct. App. Div. Mar. 29, 2019) (unpublished) (collecting cases; affirming order applying anti-concurrent causation clause to exclude insured restaurant's claim for lost revenue due to government order closing park containing restaurant because government closure order was partially motivated by park flooding and flood damage was an exclusion in restaurant's policy).  The law on such "anti-concurrent causation" language was thus not novel, even if its application to a virus would have been. *Contra Venezie Sporting Goods*, 2020 WL 5651598, at *4 n.3 ("The [concurrent cause] cases offered by Defendants, however, are federal court cases applying Pennsylvania law in water or flood exclusion contexts, which is a body of case law far more developed than the [virus] situation presented here.").  Thus, the purported novelty of the first issue does not support a conclusion that the third *Reifer* factor weighs in favor of

-34-

abstention.[12]

Nor does INC's request that the policy's virus exclusion be

---

[12] Without ruling on the merits of INC's claim, the existence of the anti-concurrent causation clause would suggest that the "key" question identified by the District Court—"whether Plaintiff's business losses were caused by the presence of the COVID-19 virus or, rather, caused by the Executive Orders which prompted the closure of Plaintiff's restaurant"—is not so important in light of the virus exclusion.  The anti-concurrent causation language turns the exclusion inquiry into a question of whether the government orders themselves were caused by the COVID-19 virus, not whether the orders were the superseding cause of any loss.  *See Mac Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co.*, No. CAM L 002629-20, 2020 WL 7422374, at *8 (N.J. Super. Ct. Law Div. Nov. 5, 2020) (granting motion to dismiss; holding that because of anti-concurrent causation provision, "[i]t therefore does not matter whether the closure of plaintiff's business as a result of governmental orders to prevent the spread of the coronavirus constitutes direct physical damage to covered property, nor whether civil authority coverage can be triggered, since the reason for the exercise of that civil authority was the virus"); *cf. Atwells Realty Corp. v. Scottsdale Ins. Co.*, C.A. No. PC-2020-04607, 2021 R.I. Super. LEXIS 49, at *33–34 (June 4, 2021) (denying in part motion to dismiss and applying Rhode Island law; holding that virus exclusion that lacked anti-concurrent causation language—while other exclusions in policy used such language—did not foreclose plaintiff at motion-to-dismiss stage from making claim that government orders, and not virus, was cause of lost income).

declared void as against public policy weigh in favor of abstention. It is, generally, of no moment that a federal court is being asked to apply state public policy. Indeed, "[t]he essence of diversity jurisdiction is that a federal court enforces State law and State policy." *Beneficial Indus. Loan Corp. v. Smith.*, 170 F.2d 44, 53 (3d Cir. 1948) (quoting *Angel v. Bullington*, 330 U.S. 183, 191 (1947)). As we stated in *Reifer*, "[f]ederal courts are, of course, perfectly capable of applying state law, even where nonfrivolous arguments are raised to change it." 751 F.3d at 149. INC does not suggest that federal courts are incapable of declaring an insurance provision void as against New Jersey public policy or that they are somehow unequipped to properly consider arguments for or against recognizing a provision as such.

It is true that in *Reifer* we affirmed a district court's abstention under the DJA because the plaintiff in her state-court complaint had made an argument, based at least in part on public policy, for "carving an exception to governing Pennsylvania law." *Id.* at 148–49. In concluding that her argument was "best decided in the state court system" we deemed it "important[]" that the plaintiff's argument "implicate[d] the policies underlying Pennsylvania's rules governing attorney conduct, which are promulgated by the Pennsylvania Supreme Court." *Id.* at 149. "[B]ecause [her argument] directly raise[d] a matter *peculiarly within the purview of [Pennsylvania's] highest court*," we thought it was "best decided in the Pennsylvania court system." *Id.* (emphasis added).

Although INC has not articulated what public policy argument it would make in favor of voiding its policy's virus

-36-

exclusion clause, any argument INC might posit would not be peculiarly within the purview of New Jersey's *court system*. The highest courts of New Jersey and Pennsylvania both have "exclusive" authority to regulate the bar in their respective jurisdictions, but they do not have the same regulatory authority over public health, or insurance generally. *See, e.g., GE Cap. Mortg. Servs., Inc. v. N.J. Title Ins. Co.*, 754 A.2d 558, 560 (N.J. Super. Ct. App. Div. 2000) ("Under our State Constitution, the Supreme Court is vested with exclusive authority over the regulation of the Bar." (citing N.J. Const. art. VI, § 2, ¶ 3)); *Beyers v. Richmond*, 937 A.2d 1082, 1090 (Pa. 2007) (citing Pa. Const. art. V, § 10(c)).

It is of no significance to this case "that insurance coverage is a creation of state law, with policy language and premium rates being approved" by a state's insurance regulator. *DiAnoia's*, 2020 WL 5051459, at *4. After parties enter into an insurance policy with language approved by a state's regulator, it is unclear what special call that regulator or that state's court system has to weigh any public policy arguments implicated by disputes over that policy's terms.[13] "An insurance policy is a contract" interpreted by courts, *Villa*, 947 A.2d at 1222, and sister-state courts and federal courts are equally capable of applying state contract law. That includes state contract law on public policy exceptions. If New Jersey's

---

[13] Any argument that New Jersey's courts or its insurance regulator have a special connection to disputes over policy language is especially weak in this case. The virus exclusion in INC's policy with AmGUARD (under New Jersey law) is identical to the one contained in Umami's policy with Motorists (under Pennsylvania law).

courts were also tasked with issuing public health orders that are implicated by virus exclusion clauses, like the Pennsylvania Supreme Court and its exclusive authority over the Rules of Professional Conduct in *Reifer*, then that could be considered by a federal court when declining to exercise jurisdiction over an insurance dispute.  Given the lack of any such public health authority, the issue of a virus exclusion being void as against public policy is not "peculiarly within the purview" of the state courts so as to weigh in favor of abstention.

Aside from the two virus exclusion issues, the *INC* Court identified two other issues as unsettled under state law: whether INC suffered any physical loss or damage from a government order, and whether INC met the requirements for civil authority coverage under the policy.  It is possible that one or both of these issues were unsettled at the time of remand.[14]

---

[14] In analyzing the fifth *Reifer* factor, the District Court stated that "the law on this issue remains unsettled." *INC*, 495 F. Supp. 3d at 336.  It did not identify the state law issue to which it referred.  Yet, the Court went on to quote a hearing at which a New Jersey state court judge, in denying an insurer's motion to dismiss, determined that "there is limited legal authority in the State of New Jersey addressing this issue." *Id.* (citing *Optical Servs.*, 2020 N.J. Super. Unpub. LEXIS 1782, at *24). As the New Jersey court used the term, "this issue" was whether "plaintiffs' loss of use of their respective properties [by operation of the Governor's executive order] . . . constitute[s] a [']direct physical loss[']" under the policy. *Optical Servs.*, 2020 N.J. Super. Unpub. LEXIS 1782, at *23–24.  The New Jersey court in that case did not interpret any

-38-

However, because the District Court concluded that the third *Reifer* factor weighed in favor of abstention, in part, because of the virus exclusion issues, we will vacate the Court's order in *INC* and remand for further proceedings.  On remand, the Court should give renewed and rigorous consideration to all relevant factors[15] to determine whether they outweigh the lack of parallel state proceedings and continue to squarely address any alleged novelty of state law issues.

## V. Conclusion

The   District   Courts   all   correctly   rejected   Insurers'

---

virus exclusion because the parties agreed that the relevant policy's virus contamination exclusion did not apply.  *Id.* at *7–8.

[15] The metaphorical "forest" in these COVID times, Diss. Op. at 3, 6, consists of similarly metaphorical "trees"—cases filed in the district courts of the Third Circuit—which cannot make their way to trial because of the pandemic.  We judicially note that all vicinages within our circuit have been unable to conduct more than the occasional trial since March of 2020. And when pandemic and related conditions actually permit a trial to go forward, the district court clerk's office can administratively support only one or two trials at a time, no matter how many judges are stationed in a particular courthouse.  So what judges have been doing is conscientiously deciding motions—which is what they have done here.  We are confident that the District Judges proceeding in these matters we now consider will take on the issues remanded to them with the same dedication they have demonstrated throughout the pandemic.

-39-

contention that Restaurants' complaints here were for legal relief "masquerading" as declaratory relief.  But in weighing factors relevant to the exercise of discretion under the DJA, the Courts either misinterpreted certain *Reifer* factors, failed to squarely address the alleged novelty of state law issues, or did not create a record sufficient to enable us to effectively conduct abuse of discretion review.  We will vacate the orders on appeal and remand for renewed consideration under the DJA and the *Reifer* factors as clarified by this opinion.

*DiAnoia's Eatery, LLC, v. Motorists Insurance Company;*
*Umami Pittsburgh, LLC, v. Motorists Insurance Company;*
*Mark Daniel Hospitality LLC, d/b/a INC v. AmGuard*
*Insurance Company*

Nos. 20-2954; 20-2958; 20-3122

_____

_____

ROTH, <u>Circuit Judge</u>, dissenting:

The COVID-19 global pandemic and resulting government stay-at-home orders have presented significant economic impacts on state institutions nationwide. Businesses across the nation were not able to access and use their premises for over a year and have sustained substantial income losses as a result. The District Courts found that these cases, which resulted from the pandemic, raised novel and important public policy issues that uniquely affect the states and, for these reasons, concluded that these cases should be decided in the first instance by the Commonwealth of Pennsylvania and the State of New Jersey through their own courts. I agree.

However, the Majority has determined that the District Courts erred because they did not sufficiently consider the relevant *Reifer* factors. But *Reifer* is not exhaustive. Therefore, even if the District Courts' analysis of some *Reifer* factors was deficient, there is no need for renewed consideration of those factors in view of alternative considerations that justify the District Courts' decisions to decline jurisdiction under the Declaratory Judgment Act (DJA).

Moreover, these issues need to be decided. Sending these cases back to the District Courts for further investigation of the *Reifer* factors will have the unfortunate result of delaying for months, if not for years, decisions on this important issue of insurance law. I believe that it is vital in these cases to obtain, as soon as we can, court decisions on the validity of these insurance policy exclusions.

Accordingly, I respectfully dissent.

## I.

Our Circuit divides declaratory judgment cases into two categories: those with independent legal claims, and those without.[1] Cases that only involve declaratory claims confer broader discretion on district courts to decline hearing those claims.[2] As the Majority correctly concludes, the cases here involve only declaratory claims. In this category of cases, our precedents "counsel hesitation by federal courts in exercising jurisdiction [] where the state law involved is close or unsettled."[3] Yet the Majority wants to restrict the District Courts' broad discretion to abstain in these kinds of cases by requiring an overly technical application of this Court's decision in *Reifer v. Westport Ins. Corp.,*[4] that overrides other relevant considerations.

---

[1] *See Rarick v. Federated Serv. Ins. Co.*, 852 F. 3d 223, 229 (3d Cir. 2017) (defining independent legal claims); *State Auto Ins. Cos. v. Summy*, 234 F. 3d 131, 134 (3d Cir. 2000) (distinguishing cases without independent legal claims).

[2] *Summy*, 234 F. 3d at 134.

[3] *Id*. at 135.

[4] 751 F. 3d 129, 141 (3d Cir. 2014).

In *Reifer*, our Court instructed district courts to give "meaningful consideration to the following factors to the extent they are relevant":

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
> (2) the convenience of the parties;
> (3) the public interest in settlement of the uncertainty of obligation;
> (4) the availability and relative convenience of other remedies;
> (5) a general policy of restraint when the same issues are pending in a state court;
> (6) avoidance of duplicative litigation;
> (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and
> (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.[5]

That said, *Reifer* emphasized that these factors "*are non-exhaustive*, and [sometimes] district courts must consult and

---

[5] *Reifer*, 751 F.3d at 146.

3

address *other relevant caselaw or considerations*."[6] Nevertheless, the Majority's decision here treats the *Reifer* factors like they are exhaustive and override any other relevant considerations. The result is that the Majority's opinion misses the forest for the trees.

In concluding that the District Courts erred in weighing the third *Reifer* factor, the Majority finds that the states' interests in making their own policy decisions are "of no moment" because it is not within the purview of state courts to determine public health policy. Yet this finding ignores the Supreme Court's holding that, even in cases involving independent claims over which federal courts have a virtually unflagging obligation to exercise jurisdiction, remand under the DJA is appropriate "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose *importance transcends the case then at bar*."[7] The Court has further noted that "the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."[8]

The legal issues presented here implicate difficult questions bearing on state policy problems that are of substantial public import. The unguided declarations of federal courts are likely to disrupt each state's development of a coherent policy governing its economic recovery from the

---

[6] *Id.*

[7] *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 814 (1976) (emphasis added).

[8] *Id.*

pandemic. At least one of these Plaintiffs has specifically alleged that the application of virus-related provisions in their insurance contracts are void as against New Jersey public policy.[9] That difficult issue implicates both moral and economic decisions about how each state wants to treat thousands of businesses operating in their borders.

What is more, any decision in these cases will likely yield sweeping consequences for each state's economy. On one hand, a decision favoring the insurers will be catastrophic for many businesses in the hospitality and entertainment industries that were forced to shut down. The fallout to follow from the closure of these businesses is likely to wreak havoc on each state's economy; for example, business closures will likely raise the state's unemployment rates, increasing the strain on each state's budget as a result of an accompanying rise in unemployment claims. On the other hand, a decision favoring the insureds places the insurance industry in a position to provide coverage for unimaginable losses caused by a global pandemic that could force these companies into bankruptcy, creating ripple effects for other insureds seeking coverage from these insurance companies for unrelated losses.

Regardless of the actual outcome in these cases, the consequences for the states are sweeping and there is an obvious need for each state to step in and develop a coherent policy to manage its own economic recovery from the COVID-19 pandemic and potential fallout. Yet, in the face of these sweeping consequences and unique set of circumstances, the Majority employs a hyper-technical interpretation of the third *Reifer* factor to conclude that the District Courts erred.

---

[9] AmGuard's Appx. 25.

Although our decision in *Reifer* found remand particularly appropriate because Reifer raised non-frivolous policy arguments involving Pennsylvania's rules governing attorney conduct that were "peculiarly within the purview of that state's highest court,"[10] that is not the only circumstance in which remand based on public policy is appropriate.  The Supreme Court has made this clear.[11]

Next, the Majority finds that the fifth *Reifer* factor only applies when the issues pending in state court involve the same parties.  The Majority raises a concern that the District Courts had found that "there are countless insurance cases pending in state courts which implicate some common application of state law."[12]  The Majority also finds that the "District Courts' alternative understanding of the first *Reifer* factor would place a thumb on the scale in favor of abstention in the many diversity jurisdiction cases raising issues which have not been resolved by the relevant state's highest court."[13]  These conclusions also miss the forest for the trees.

First, these cases do not involve "application of a settled question of state law."  These cases are deeply tied to state public policy and the application of COVID-specific public policy issues relating to insurance contract interpretation.  Again, those issues are *novel* and involve some of the most substantial policy questions of the last century.

---

[10] *Reifer*, 751 F.3d at 149.
[11] *Colo. River Water Conservation Dist.*, 424 U.S. at 814.
[12] Maj. at 32.
[13] Maj. at 30.

Second, we have never held that parallel state proceedings are irrelevant just because they involve different parties. It is true, as the Majority states, that the presence of state proceedings involving similar issues among different parties *normally* would not militate against exercising federal jurisdiction in insurance coverage cases. Certainly, federal courts should not abstain just because there is unrelated state-court litigation involving an insurance provision similar to the provision being litigated in federal court. But these are not the run-of-the-mill insurance coverage cases involving merely similar contract provisions to those being litigated in state courts: They involve the application of those contract provisions to claims for direct and indirect losses caused by a global pandemic that implicate *novel* and *significant* state policies. As explained above, there is undoubtedly a public interest in deciding whether the application of virus exclusion provisions to losses arising from the COVID-19 pandemic are void as against state public policy governing the economic recovery from the pandemic; these are questions that should be left to the states to decide in the first instance.

Finally, our Court has held that "we can garner assistance from the decisions of the state's intermediate appellate courts in predicting how the state's highest court would rule."[14] But in the absence of guidance from *any* intermediate state court that can help predict how they would address difficult questions of state law bearing on a novel and important public policy problem, federal courts ought to

---

[14] *Maynard v. Rivera*, 675 F.3d 225, 230 (3d Cir. 2012) (quoting *Mosley v. Wilson*, 102 F.3d 85, 92 (3d Cir. 1996)).

abstain from making an *Erie* guess.[15]  That is exactly what the District Courts correctly did here.

We lack any guidance to predict how each state's highest court would rule.[16]  Therefore, cases among similarly situated parties pending in the state system will likely supply the necessary guidance for federal courts in resolving these issues.  Indeed, the cases pending in state courts involve substantially similar, difficult issues of state law "bearing on policy problems of substantial public import whose importance transcends" that of the cases at bar.[17] Although an *Erie* guess in these cases might resolve the uncertainty in the obligations of those at bar, it will undoubtedly create additional uncertainty for parties that are similarly situated by potentially upending the uniformity of outcomes between state and federal courts. Such a result flies in the face of the Supreme Court's instruction to federal courts on how to proceed when asked to resolve novel or difficult questions of state law that involve public policy problems of substantial public import, policies

---

[15] *Summy*, 234 F.3d at 135 ("[I]t is counterproductive for a district court to entertain jurisdiction over a declaratory judgment action that implicates unsettled questions of state law, questions which might otherwise be candidates for certification to the state's highest court. Such matters should proceed in normal fashion through the state court system.").

[16] The Courts could not find any cases from intermediate state courts involving a similar set of circumstances that could guide their resolutions of the issues at bar. *See* Motorists' Appx. 6, 19 (emphasizing the lack of guidance from state courts in resolving these issues); AmGuard's Appx. 12 (same).

[17] *Prosmushkin, P.C. v. Hanover Insurance Group*, 479 F.Supp.3d 143, 150 (E.D. Pa. Aug. 14, 2020)(quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 814).

that transcend the importance of the cases at bar.[18]   It would also be an incentive for forum shopping between state and federal courts -- precisely what *Reifer* aimed to prevent.

Ultimately, it is the decisions issued by state courts that will determine other litigants' rights and obligations regarding insurance coverage claims arising from the COVID-19 pandemic, not the speculative declarations of federal courts predicting difficult questions of state law.   There is no reason why these litigants should be left in the lurch and not benefit from those courts' authoritative determinations of state public policy.   The paucity of state court authority and the existence of forthcoming state-court decisions addressing these policy matters thus further militates against federal jurisdiction. Federal courts "do not establish state law, [they] are limited to predicting it."[19]   Absent guidance from state courts on how to resolve these questions and given the sweeping economic consequences that a decision will have on the rights and obligations of the parties and of those similarly situated, it is more prudent and efficient for federal courts to abstain.[20]   No more need be said.

## II.

In short, the District Courts sufficiently addressed the factors relevant to their decisions to abstain from exercising jurisdiction under the DJA.   These Courts had sufficient facts

---

[18] *Colo. River Water Conservation Dist.*, 424 U.S. at 814.

[19] *Summy*, 234 F.3d at 135.

[20] "It is not our function to find our way through a maze of local statutes and decisions on so technical and specialized a subject [matter] . . . .   For one thing, it is too easy to lose our way." *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 497 (1942).

9

on the record to support their conclusion that the matters before them implicate substantial questions of public policy whose import transcends the cases at bar.  Absent guidance from state courts, these questions ought to be resolved by state courts in the first instance and they should be decided without undue delay.  Even if their consideration of the *Reifer* factors was deficient—which I believe it was not—that deficiency does not warrant the delay for a renewed consideration of those factors in light of the alternative considerations that support their exercise of discretion.

For these reasons, I would affirm the judgments of the District Courts.

10